Aaron D. Lebenta (10180)
**CLYDE SNOW & SESSIONS, P.C.**
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Tel/Fax: 801.322-2516
adl@clydesnow.com

Maranda E. Fritz (*pro hac vice to be filed*)
MARANDA E. FRITZ, P.C.
521 Fifth Avenue, 17th Floor
New York, New York 10175
Telephone: 646.584.8231
maranda@fritzpc.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL SECURITIES CLEARING CORPORATION; and THE DEPOSITORY TRUST & CLEARING CORPORATION,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiff Alpine Securities Corporation ("Alpine" or "Plaintiff"), by and through its undersigned counsel, files this Complaint against Defendants National Securities Clearing Corporation ("NSCC"), and The Depository Trust & Clearing Corporation ("DTCC") (collectively, sometimes, "Defendants") seeking declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. This action presents the critical issue of whether a government agency, imbued by Congress with sweeping powers to regulate and control United States

securities markets, can delegate and outsource those governmental powers to a purportedly private entity that insists that it is not bound by and need not adhere to the United States Constitution. The dangers inherent in that machination are evident: governmental power could be transferred to and wielded by purportedly "private" entities that fail to comply with the Constitutional safeguards that were embedded in the Constitution precisely to prevent governmental overreach and the taking of property without due process.

2.      The issue arises here in relation to actions of Defendants DTCC and its subsidiary, NSCC, a self-regulatory organization empowered by the Securities and Exchange Commission ("SEC") to serve as the clearing agency for virtually all securities transactions in the United States.

3.      In this action, Plaintiffs challenge the unconstitutional operation and structure of DTCC and NSCC, the entities that are controlling access to markets both by imposing massive, individualized deposit requirements on particular transactions and, more recently, through a 1000% escalation of the capitalization requirements for firms to be a member of and able to trade through NSCC.

4.      DTCC is the holding company that owns and controls these entities that, pursuant to power conferred by Congress, oversee operations of the United States securities markets and settle virtually all trades occurring in those markets.

5.      DTCC's operational subsidiary, NSCC, is a self-regulatory organization ("SRO") and registered clearing agency with the SEC that provides centralized clearance, settlement and information services for virtually all broker-to-

broker equity, corporate bond, municipal bond, and other securities transactions in the United States.

6.     DTCC also owns and operates the Depository Trust Corporation ("DTC"), the nation's principal securities depository.

7.     Collectively, Defendants have acquired a virtual monopoly over the clearing and settlement process essential to the national securities market system and thus exercise near-absolute control over the right to access and participate in securities markets in the United States.

8.     As discussed below, the Board of Directors ("Board") and management of DTCC manage and direct the operations of NSCC and DTC that are improperly limiting and controlling access to the securities markets by firms, investors and issuers.

9.     Despite purporting to be private corporations, Defendants wield massive governmental power and authority over the securities industry and the securities markets while simultaneously denying that they have any obligation to abide by the fundamental protections embodied in the United States Constitution that protect individuals and entities from the improper exercise of such governmental power.

10.     Based on their characteristics and conduct, and notwithstanding Defendants' purported status as private corporations, Defendants engage in state actions that are subject to the limits of the Constitution.

11.     Defendants do not consider themselves bound by the Constitution and do not comply with the Constitution.   Their current structure and operations contravene the separation of powers, violate the Appointments Clause, and constitute an impermissible delegation of powers.

12.     Defendants have used their governmental power and authority to pursue policies and impose restrictions on the securities markets that are not endorsed by or even consistent with the views of Congress.   In fact, Congress has emphasized the need to encourage capital raising by small businesses, "the lifeblood of the U.S. economy," noting that in the wake of increased regulatory actions that "discourage the flow of capital investment needed to even start a new business," there had been a 23% drop in the number of new businesses launched."[1] In Congress' view, there was a "bipartisan consensus" in favor of "making it easier for entrepreneurs to obtain funding."[2]   Based on those concerns, Congress passed the JOBS Act, predicated on an understanding of the critical role occupied by new businesses in America and the need to "remove a number of barriers that were preventing aspiring entrepreneurs from getting funding."[3]

---

[1] Senate Hearing 112-444, *Spurring Job Growth Through Capital Formation While Protecting Investors*, available at https://www.govinfo.gov/content/pkg/CHRG-112shrg74738/html/CHRG-112shrg74738.htm.
[2] *Id.*
[3] Remarks by the President at JOBS Act Bill Signing, available at https://obamawhitehouse.archives.gov/the-press-office/2012/04/05/remarks-president-jobs-act-bill-signing.

13.     The actions taken by DTCC and NSCC are contrary to the aims and efforts of Congress and the President.  They are choking the ability of small business to grow and finance their operations because, by virtue of the actions directed toward those few firms that remain willing to execute trades in the microcap markets, they are preventing small business from raising capital by making it impossible for anyone to trade in stock issued by small businesses.

14.     For the past several years, for example, Defendants have imposed new, onerous and baseless "margin" charges on trades, under the auspices of mitigating purported central-counterparty risk faced by NSCC.  These charges disproportionately target and impact the over-the-counter ("OTC") and microcap markets, the broker-dealers who serve those markets, such as Alpine, and the investors and small company issuers who participate in, and rely upon, those markets.

15.     Most recently, on August 26, 2023, Defendants began implementing a new NSCC rule change, approved by the SEC, that increased the minimum Excess Net Capital ("ENC") membership requirements for broker-dealer by 1,000%; for a broker-dealer member such as Alpine, who purportedly "clears for others" and provides clearing services for the OTC and microcap markets, this meant that the firm's ENC requirements skyrocketed from $1 million to $10 million.

16.     Those new capitalization requirements are many multiples of and at odds with the capitalization requirements for firms established by the SEC, which assessed capital needs associated with broker-dealers and set them at *$250,000.00*.

17.     The DTCC and NSCC requirements not only are discriminatory, onerous, inconsistent with Congressional intent but also are based on a fiction. DTCC claims that they are justified by their complex and internal calculations of risk associated with the transactions.  Specifically, DTCC and NSCC claim that NSCC might have to buy-in shares to close out  a member's open sell positions in the event of a failure to deliver the stock by that member.   In fact, for a member like Alpine, there is actually no calculable risk of any potential loss to NSCC because Alpine *only* executes sell orders for customers whose stock *is already in its account at DTC.*  The risk that Alpine and DTC would both fail to deliver that stock to NSCC to close a transaction does not exist.  Nonetheless, to address this nonexistent risk, Alpine is subject to NSCC deposit requirements on each transaction, and to retain its membership in NSCC, in an amount that is roughly *triple* the total amount of trading conducted by the firm.

18.     Alpine attempted to obtain financing to satisfy the new ENC requirements but the Financial Industry Regulatory Authority ("FINRA"), another purportedly private entity exercising governmental power, has refused to "approve" that loan because Alpine could not provide the bank statements of the individual who had provided the funds to the lender.

19.     Alpine sought to modify its operations to limit its activities to self-clearing only, so as to be subject to the lower self-clearing ENC requirement of $5 million.  In response, DTCC devised and deployed an interpretation of the rule that would still prevent Alpine from operating, even in its self-clearing capacity, unless it

satisfied the higher ENC requirement of $10 million applicable to those firms that "clear for others."  DTCC claimed that it would have to "evaluate" and approve Alpine's decision to limit its activities to self-clearing. DTCC continued to insist that Alpine was required to maintain $10 million and that it would not be permitted to engage in self-clearing business even if it had greater than $5 million ENC.  As a result of the improper actions of FINRA and DTCC in their exercise of governmental authority conferred by Congress, Alpine's indirect owner has been forced to place more than $6 million in the firm to prevent it from being shut down and preserve jobs, resulting in damage to the owner.

20.    Upon information and belief, the escalating capital requirements – including, but not limited to, the increased ENC membership requirements and disproportionately onerous margin charges imposed on trades in OTC and microcap stocks are discriminatory in purpose and effect. They have a significantly greater detrimental impact upon, and reduce the number of, small broker-dealer members of NSCC, who are the only broker-dealers remaining who provide clearance and settlement services for the OTC and microcap stock transactions and accept certificates of new issued securities for microcap issuers.

21.    DTCC's Board, and thus NSCC's Board, is comprised primarily of representatives affiliated with large banking and brokerage firms, which, upon information and belief, would welcome the elimination of the small broker-dealer members and the customers, issuers and markets they serve.

22.     Because Defendants are exercising unconstitutional delegated executive authority, with a Board and/or officers that are not accountable to, and cannot be removed by, the President, action by this Court is necessary to stop Defendants' unconstitutional structure and actions and to ensure that, in the exercise of its sweeping governmental powers, Defendants are required to afford due process of law prior to any taking or deprivation of property.

## PARTIES

23.      Alpine is a thirty-year old small, self-clearing broker-dealer, located in Salt Lake City, Utah.  Alpine is registered with the SEC and is a clearing-broker member of NSCC and its sister corporation, DTC.

24.     Alpine's primary business for decades has been clearing liquidation (or sale-side) microcap or OTC stock transactions for itself and other firms including an affiliated company with the same ownership, Scottsdale Capital Advisors ("SCA").

25.     Upon information and belief, DTCC is a New York corporation with its principal place of business in Jersey City, New Jersey.

26.     Upon information and belief, DTCC is a non-public holding company which wholly owns, controls and operates through NSCC, DTC and the Fixed Income Clearing Corporation ("FICC"), all three of which are SROs and registered clearing agencies with the SEC and are designated as Systematically Important Financial Market Utilities ("SIFMUs") under Article VIII of the Dodd Frank Act.

27.     Upon information and belief, NSCC is a New York corporation with its principal place of business in New York City, New York.

28.     NSCC is a clearing agency registered with the SEC pursuant to Section 17A, 15 U.S.C. § 78q-1, of the Securities and Exchange Act of 1934 (the "Exchange Act"). As an SRO, NSCC is also subject to Section 19 of the Exchange Act, 15 U.S.C. § 78s.

29.     NSCC provides centralized clearance, settlement and information services for virtually all broker-to-broker equity, corporate bond, municipal bond, and other securities transactions in the United States. *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.,* 559 F.3d 772, 776-77 (8th Cir. 2009).

30.     Upon information and belief, the Board for DTCC and NSCC is comprised of the same or substantially the same individuals, and many of DTCC's officers and employees are also officers and employees of NSCC, including the same president and CEO.

31.     NSCC does not maintain a separate website, but rather is described and discussed only as part of DTCC's website: https://www.dtcc.com.

32.     DTCC also wholly owns non-party DTC and, upon information and belief, DTCC and DTC also share a common Board – DTCC's Board – and many of the same officers and employees.  Like NSCC, DTC has no separate website but is part of DTCC's website.

33.     DTC is the nation's principal securities depository for the national markets and accounts for the book-entry movements of securities from firm to firm. DTC maintains physical possession of stock certificates and, through its nominee

Cede & Co., is the direct record holder of all securities for all of its members which include most securities brokers and dealers in the United States and NSCC.

34.     Although DTCC is not itself a registered clearing agency, upon information and belief, DTCC and its board of directors and officers control all aspects of NSCC's and DTC's operations, and there is no meaningful separation or distinction between DTCC and NSCC.

35.     Defendants, through this integrated structure, thereby control access to and the functioning of the national securities markets through their control of the essential clearance and settlement process – a quintessential governmental function that Congress entrusted to the SEC. *See* 15 U.S.C. § 78q-1(a).   As a result, Defendants are agencies, establishments and/or instrumentalities of the United States.

36.     Alpine has standing to assert these claims because it is a regulated party and a member of NSCC and shareholder in DTCC, which has experienced the direct impact of Defendants' unconstitutional operations and has suffered and will continue to suffer injury and damage as a result of their actions.

## JURISDICTION AND VENUE

37.     This dispute arises under the Constitution of the United States and thus this Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201, and 15 U.S.C. § 78aa.

38.      Pursuant to *Axon Enterprise Inc. v. FTC*, 143 S.Ct. 890 (2023), *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, (2010), 15 U.S.C. §78aa, and 28 U.S.C. § 1391, jurisdiction and venue are appropriate in this Court.

39.      The claims in this case challenge the constitutionality of Defendants' structure and operations.   As such, Alpine's claims are collateral to any administrative review process, and the administrative review structure, set forth in Section 17A, 15 U.S.C. § 78q-1, and Section 19(d)-(f), 15 U.S.C. § 78s(d)-(f), of the Exchange Act. The claims asserting constitutional violations are beyond the expertise of Defendants or the SEC and are appropriately before this Court pursuant to 28 U.S.C. §§ 1331 and 2201, and 15 U.S.C. §78aa, and as determined in Axon, supra, and Free Enterprise, supra.

40.      A panel of the D.C. Circuit recently entered an injunction pending appeal based on a similar constitutional challenge to the structure and operations of FINRA, holding that that the Plaintiff was likely to prevail on its argument that FINRA was a state actor and/or engaged in state action and is therefore required to adhere to the Constitution.  Alpine Sec. Corp. v. FINRA, D.C. Cir. Case No. 23-5129, 2023 WL 4703307 (D.C. Cir., July 5, 2023).

41.      Further, this Court has personal jurisdiction over Defendants because they conduct business in every state, and exercise pervasive regulatory activities, including control over the national securities markets, with direct impacts in every state, including Utah. Defendants also directly regulate Alpine and other Utah based broker-dealer members in Utah, impose and collect membership fees and margin

charges from Alpine and other broker-dealer members in Utah, and directly impact Alpine's and other Utah-based broker-dealers' ability to conduct operations and earn revenue in Utah, including to execute and clear trades for customers located in Utah.

## GENERAL ALLEGATIONS

### I.     Overview of NSCC's General Operations and Structure

42.     In 1934, Congress enacted the Exchange Act which required securities firms to register with the SEC if they were a broker or dealer and effected transactions other than on a national securities exchange.

43.     In 1975, Congress added Section 17A to the Exchange Act, which directed the Commission to facilitate the establishment of a national system for the "prompt and accurate clearance and settlement of transactions in securities," and to eliminate the physical movement of securities certificates among brokers and dealers. 15 U.S.C. § 78q-1(a)(2)(A)(i), (e).

44.     Section 17A also authorized the SEC to register and regulate clearing agencies. It is unlawful to operate or perform the functions of a clearing agency with respect to any security unless registered with the SEC.  15 U.S.C. § 78q-1(b).

45.     The SEC effectively outsourced the obligations set forth in Section 17A to establish a national clearance and settlement system by redelegating it to registered clearing agencies including NSCC and DTC.

46.     As a registered clearing agency, NSCC is also an SRO.  *See* 15 U.S.C. § 78c(a)(26) ("The term 'self-regulatory organization' means any national securities exchange, registered securities association, or registered clearing agency...").

47.     The SEC thereby used the power conferred on it by Congress under Section 17A to grant monopolistic control over the clearing and settlement process necessary to participate in and access the United States securities markets to a single organization – DTCC – by and through its wholly owned subsidiaries NSCC and DTC.

48.     NSCC interposes itself as the central counterparty to each trade and guarantees both ends of the settlement of a trade – *i.e.*, the delivery obligations of every seller, and the payment obligations of every buyer – in the event of a default of one of the original buyers or sellers.  NSCC assumes this role for virtually all securities transactions in the United States.

49.     The clearing and settlement system requires integration between NSCC and DTC, such that NSCC's clearing firm members are DTC participants (along with other broker-dealers) that hold securities in depository accounts at the DTC.  Because securities are held in street name and ownership records are held in electronic form, delivery in the settlement of a trade takes the form of a book entry movement of securities entitlements from one broker-dealer's DTC account to another.  Delivery is precipitated when the DTC receives delivery instructions from NSCC, which is authorized to give such instructions for the delivering account.  As NSCC is the central counterparty, shares are delivered from a broker-dealer's DTC account to NSCC's account or from NSCC's account to a broker-dealer's DTC account.

50.    Thus, NSCC and DTC – as well as DTCC, through its ownership and control over NSCC and DTC – function as gate keepers to the nation's securities markets, as an instrumentality of the United States' government, exercising the powers, and fulfilling the obligations, conferred on the SEC for this purpose by Congress.

51.    In order to operate as a clearing broker and provide clearing and settlement services for its customers, Alpine must be a member of NSCC and have access to its services.

52.    Given Defendants' gatekeeper function and position as the central counterparty for virtually every securities transaction in America, however, all market participants are impacted by Defendants operations and decisions.

## II.    Defendants Wield Expansive Governmental Power and are State Actors

53.    Defendants purport to be private, government-authorized entities.  In reality, they are inextricably intertwined with, and act as an extension of, the federal government, wielding significant executive power.

54.    The SEC has delegated a critically important governmental function to Defendants by granting them a monopolistic control over the clearance and settlement of virtually all securities transactions in the national securities markets and thus control over access to, and the essential functioning of, the national securities markets – a responsibility Congress entrusted to the SEC in both Section 17A and the Exchange Act, in general.

55.     The SEC has bestowed such extensive power on Defendants that both NSCC and DTC have been designated as significantly important financial market utilities (SIFMUs) under Article VIII of Dodd Frank.

56.     The SEC possesses the ability to exercise significant control over NSCC, as both a registered clearing agency and an SRO. Among other things:

a.     The SEC must vet and approve NSCC's rules and any amendments to NSCC's rules before taking effect, and thus controls the content of NSCC's rules.  *See* 15 U.S.C. § 78q-1(b)(3); 15 U.S.C. § 78s(b).

b.     The SEC has the authority to adopt rules for clearing agencies.  15 U.S.C. § 78q-1(d).

c.     The SEC has the authority to abrogate, amend or delete an existing rule of an SRO, including the rules of the NSCC, as a registered clearing agency. 15 U.S.C. §§§ 78a-1(d), 78w(a), 78s(c)(4).

d.     The SEC requires that NSCC enforce compliance with its rules and to discipline members for noncompliance.   *See* 15 U.S.C. §§ 78s(g)(1), 78q-1(b)(3)(g)-(h)

e.     Like other SROs, the SEC may remove NSCC's officers and directors if they do not enforce government standards.  15 U.S.C. § 78s(h)(4).

57.     DTCC, as the parent company of NSCC, and NSCC itself, through the authority bestowed upon it by the SEC, dictate essential business activities of members of the public, including who may serve as a clearing broker-dealer, through its membership requirements, margin requirements, and other rules.

58.     The authority NSCC "exercises ultimately belongs to the SEC," and it has "'no authority to regulate independently of the SEC's control.'" *National Ass'n of Securities Dealers, Inc. v. S.E.C.,* 431 F.3d 803, 806-07 (D.C. Cir. 2005) (quoting S. Rep. No. 94-75, at 23 (1975)).

59.     A panel of the D.C. Circuit recently enjoined a FINRA enforcement action against Alpine pending appeal based on the finding by the majority of the panel that Alpine had demonstrated a substantial likelihood of success on the claim that FINRA was engaged in state action and therefore subject to Constitutional constraints.   A concurrence issued by D.C. Circuit Judge Walker in that decision identified similar evidence of governmental control over FINRA in opining that FINRA was likely a governmental actor, despite being nominally private.   See Alpine Sec. Corp. v. FINRA, D.C. Cir. Case No. 23-5129, 2023 WL 4703307 (D.C. Cir., July 5, 2023).

60.     Courts have traditionally found nominally private entities to be governmental actors for constitutional purposes in such circumstances as exist with respect to Defendants here. See, e.g., Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 296 (2001) (collecting cases finding a private entity was a state actor, including when the government has provided "significant encouragement, overt or covert," when the nominally private entity "has been delegated a public function by the State," when it is "entwined with government policies," and when "government is entwined in [its] management or control." (internal quotations and citations omitted) (alterations in original).

### III.   Defendants Wield Expansive Power in Violation of the Separation of Powers.

61.   Despite claiming they are private entities, Defendants exercise significant governmental power.

62.   For example, Defendants possess and deploy improperly and unconstitutionally delegated legislative power, including, but not limited to, their broad powers to promulgate rules governing access to the public securities market, to regulate the conduct of their members, to enforce compliance with those rules and standards by levying fines on its members, and to limit or prohibit access to NSCC's essential clearing and settlement services.

63.   Among other things, Defendants also use their unconstitutionally delegated legislative power to restrict access to the securities markets by promulgating rules to impose onerous, discriminatory and baseless capital requirements and fees.

64.   More specifically, as an ongoing condition to membership, and thus access to NSCC's essential clearing and settlement services, Defendants require members to contribute daily to a "Clearing Fund" by making "Required Deposits." NSCC Rules and Procedures, Rule 2, § 1, Rule 2A, § 1(F), Rule 2B, § 1, Rule 4, § 1.

65.   The Required Deposit purportedly serves as each member's margin on trading activity and its purported purpose is to mitigate the "risk" NSCC faces as a central counterparty against potential losses to NSCC associated with liquidating a member's portfolio in the event NSCC ceases to act for that member.

66.    Upon information and belief, Defendants also use these "Required Fund Deposits," to make investments.

67.    The formula that NSCC uses to calculate the Required Deposit charges is very complex, and it is calculated and assessed on a per-member basis in accordance with a host of discretionary and fact-specific variables.  NSCC's rules currently contain over ten separate Required Deposit charges that NSCC may apply in the aggregate, and they are frequently changed.  NSCC's Rules & Procedures, at Procedure XV.

68.    A member, such as Alpine, cannot execute trades for its customers unless, in every instance, it satisfies NSCC's calculation and imposition of the Required Deposit for that particular trade, and those deposit requirements are onerous, generally exceeding the value of the underlying transactions by several orders of magnitude, and *double and triple counting the same purported risk*.

69.    NSCC compounds the issue through a lack of transparency, insisting that its formulae and risk-mitigation analysis are "proprietary" and are thus concealed from the public.

70.    In recent years, NSCC has systematically increased the margin charges in a manner that has disproportionately and discriminatorily impacted small business whose securities trade in OTC and microcap markets, and the industry professionals and participants in those markets, by placing greater emphasis on a stock's alleged market-price "volatility" and illiquidity – inherent features of OTC and microcap stock.

71.     The result is that an NSCC member, such as Alpine, providing clearing services for those market sectors are commonly required to post margin that exceeds the value of the open (unsettled) trade position by more than 10 times, i.e., $100,000 in margin to cover a $10,000 trading position.

72.     To make matters worse, the deposit requirements are entirely unjustified in relation to sell-side firms like Alpine because there is ***actually no risk*** of a potential loss to NSCC from a member that only executes sell orders for customers ***whose stock is already in its account at DTC***.  The purported risk that NSCC uses to justify its deposit requirements – that it might have to buy-in shares to close out Alpine's open sell positions – ***does not exist***;  NSCC could simply access the shares from Alpine's DTC account to close the position and satisfy NSCC's central counterparty obligation to the buyer.

73.     These exorbitant margin charges have a discriminatory and anticompetitive effect on small broker-dealer members, such as Alpine, and their customers because smaller broker-dealer members lack the capital resources to absorb large margin charges and yet, for the most part, are the only remaining firms that providing clearing services for the OTC and microcap markets.  That, in turn, has a destructive impact on small businesses who rely on the microcap/OTC markets to raise capital to fund their operations.

74.     Alpine has raised these issues with Required Deposit margin charges many times to both NSCC and the SEC, including by seeking formal SEC review, but the SEC has never addressed Alpine's arguments on their merits.

75.    Most recently, NSCC took even more drastic and direct action against its smaller-broker dealer members by amending its rules to increase the Excess Net Capital or "ENC" requirements for broker-dealer members by 1,000%.   For a member like Alpine, who purportedly "clears for others" and has a value at risk or "VaR" tier – the same volatility component used to calculate margin – of the very low amount of $500,000, this rule change meant its minimum capital requirement to maintain membership jumped from $1 million to $10 million, *in addition to* the exorbitant daily amounts it must post as margin for each particular trade. A "self-clearing" member in the same VaR tier faced the same 1,000% increase, but is only required to have ENC of $5 million.

76.    NSCC's new ENC rule became effective on August 26, 2023, with a 60-day grace period, until October 25, 2023, to become compliant.

77.    The new ENC requirement, both as designed and applied, has a discriminatory and anticompetitive effect. A ten-fold increase in capital requirements has the effect, if not the purpose, of eliminating members that have limited capital resources, such as Alpine.

78.    These increased capital requirements, together with the escalating margin requirements, impact every sector of the industry – from clearing brokers, like Alpine, to correspondent brokers-dealers, to traders and other market participants, and to the issuers who rely on market access to raise money.  Those increased capital requirements have had the effect if not the purpose of imposing prohibitively expensive costs on trading in lower-priced securities; it has forced

smaller broker-dealers out of the industry, and it has and continues to constrict the ability of small and emerging companies to raise capital and grow their businesses.

79.     NSCC has repeatedly confirmed that, if Alpine did not have the requisite amount on deposit as of October 26, 2023, it will take action against it, including by either ceasing to act for Alpine, or suspending or revoking its membership.

80.     Notably, NSCC's rules do not define the terms "self-clearing" or "clears for others," and Defendants have offered shifting explanations for the characterization.

81.     In discussions with Defendants, primarily representatives from DTCC, to try to arrive at a workable solution, Alpine has explained that it only clears for its affiliate, SCA, which is under common ownership, and thus that Alpine should be treated as self-clearing for the ENC requirements.

82.     Defendants rejected Alpine's request, and initially claimed the designation of "self-clearing" versus "clears for others" was determined by a different SRO, FINRA; DTCC took that position without citing to any provision of its rules that authorized it to defer to FINRA's determinations for clearing agency procedures and requirements.

83.     Alpine then made the decision to voluntarily limit its activities to self-clearing so that it would be subject to the lower $5 million ENC requirement for self-clearing firms.  Again, Defendants continued to demand the full $10 million ENC, vaguely claiming that ENC requirements are based on a "Member's NSCC

membership status." Alpine then notified NSCC that it was limiting its activities to self-clearing; DTCC insisted that it had the right to "evaluate" that assertion, and continued to state that Alpine was required to satisfy the full requirement of $10 million to conduct even self-clearing business.

84.     Defendants' joint Board is comprised primarily of representatives affiliated with large banking and brokerage firms, which, upon information and belief, would benefit from elimination of the small broker-dealer members, such as Alpine, and the customers, issuers and markets they serve.

85.     Upon information and belief, this played a motivating factor in Defendants' refusal to allow Alpine to proceed as a self-clearing firm subject to the lower, $5 million ENC requirement.

86.     Despite Defendants' vast enforcement and regulatory power, including to impose discriminatory and anti-competitive capital requirements without justifiable basis, and sanctions for noncompliance, those powers are largely unchecked.

87.     Defendants, their Board, and their executives and officers are immune from the supervision and control of the President. Defendants' Board and its executives and officers are not appointed or removable by the President or by the head of any Executive Branch department answerable to the President.

88.     The SEC provides the only check on Defendants' power; however, the SEC may only remove members of NSCC's Board, and its executives and officers if they have "willfully violated" applicable laws or regulations, "willfully abused" their

authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse. 15 U.S.C. § 78s(h)(4).

89.     It is unclear, under the law, whether even the SEC has the authority to remove members of DTCC's Board or its executives and officers, notwithstanding the representative overlap with NSCC and the massive authority DTCC wields through NSCC and DTC, because DTCC is not, itself, a registered clearing agency or SRO.

90.     And the SEC commissioners cannot be removed by the President except for in limited circumstances.

91.     Thus, because the President cannot remove SEC commissioners without cause, and because the SEC cannot remove NSCC's Board members, officers or executive without cause (and may be able to do nothing at all to DTCC), the Board and its appointed executives and officers are unconstitutionally insulated from Presidential control and oversight, despite being governmental actors exercising governmental powers and functions.

92.      Defendants' acquisition and deployment of core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives under Article II, § 1 of the United States Constitution. As a result, the Defendants' operations, as well as its implementation of responsibilities delegated to it by the SEC under the Sections 17A and 19 of the Exchange Act, violates the separation of powers.

IV.    **Defendants' Hierarchy Violate the Appointments Clause.**

93.    Because Defendants operate as an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, Defendants' Board exercises significant authority pursuant to the laws of the United States, Defendants' Board members are officers of the United States whose appointments must comply with the Appointments Clause, Article II, § 2, cl. 2, of the United States Constitution.

94.    The Appointments Clause provides in relevant part that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., Art. II, § 2, cl. 2.

95.    By virtue of the discretion, duties, functions, and independence of the Defendants' Board, members of the Board are principal officers whose appointments must be made by the President with the advice and consent of the Senate as is required in relation to other government agencies. Accordingly, the selection of the Defendants' Board by its membership violates the Appointments Clause.

96.    In the alternative, the members of Defendants' Board are inferior officers whose appointments must be made by the President, a court of law, or the

head of a department.  Because Defendants' membership is not a department within the meaning of the Clause, the appointment of Defendants' Board violates the Appointments Clause.

97.     Similarly, Defendants employ executives and officers to operate Defendants and carry-out their essential functions. By virtue of their discretion, duties, functions, and independence, Defendants' executives and officers are principal officers, or alternatively, inferior officers subject to the Appointments Clause.

## V.   Defendants Wield Governmental Power But Fail To Provide Constitutional Due Process Protections.

98.     While wielding expansive and unchecked governmental powers, Defendants simultaneously eschew any obligation to comply with the Constitution, and afford its members the basic protections, including the Due Process Clause of the Fifth Amendment,  designed to prevent overzealous government action in disciplinary proceedings, before imposing fines or taking other adverse action against members that destroy their businesses, including expulsion, suspension, ceasing to act of a member or otherwise prohibiting or limiting the member's activities, functions or operations and their access to NSCC's essential clearance and settlement services.

99.     Section 17A of the Exchange Act requires that the rules of the clearing agency "provide a fair procedure with respect to disciplining of participants, the denial of participation to any person seeking participation therein, and the

prohibition or limitation by the clearing agency of any person with respect to access to services offered by the clearing agency." 15 U.S.C. § 78q-1(b)(3)(H).

100.   However, NSCC's rules provide no such fair procedure and, in fact, do not even provide members with basic components of due process of law.

101.   As detailed above, Defendants exercise  sweeping and coercive powers in a discriminatory manner designed to disadvantage market participants who operate in sectors of markets that are disfavored by Defendants and other regulators, particularly those like Plaintiff whose business focuses on the OTC and microcap markets.

102.   Defendants wield massive power in the securities industry and pursue actions based on delegated authority from the SEC and yet do not comply with governmental obligations like due process of law.

103.   As required by Section 17A of the Exchange Act, NSCC's rules provide that it may discipline any member for, *inter alia,* violations of its Rules or other "conduct detrimental to the operations of [NSCC]," and impose significant sanctions: expulsion, suspension, limitation of or restriction on activities, functions and operations, fine or censure or any other fitting sanction."  NSCC's Rules & Procedures, Rule 48, § 1.

104.   NSCC's rules require notice before disciplinary sanction is imposed and before suspending a participant or prohibiting or limiting a member's access to services offered by NSCC, except under specified circumstances where it may

"summarily" take action.  *See* NSCC's Rules & Procedures, Rule 46, §§ 2-3, Rule 48, § 2.

105.   NSCC's rules also provide "a right to hearing," but the timing of the hearing in relation to the disciplinary or other adverse action, as well as the procedures to be followed, are vague and undefined.

106.   Specifically, it is unclear from NSCC's rules whether NSCC can take disciplinary or other adverse action – effectively, put a member out of business – *before* the hearing may occur.  And, NSCC's rules include no requirements for the procedures that will govern any hearing, such as the taking and admission of evidence, whether there is any discovery or a right to call or cross-examine witnesses.  *See* NSCC's Rules & Procedures, Rules 37, 46.

107.   One of the only details that is provided is that the hearing will be before a "Panel" of three individuals drawn from the members of the Board or their designees, as selected by the Chairman of the Board. There is no apparent process for challenging the selection of Panel members, and certainly no right to have the allegations considered by a jury.  NSCC's Rules & Procedures, Rule 37, § 4.

108.   This selection process all but ensures that the member-defendant will not receive a fair hearing in front of an impartial adjudicator, because the Panel is selected from the directors of the very entity leveling the charges and allegations. Further, because, as indicated above, DTCC owns NSCC and it is believed that the entities share the same Board and many of the same officers and executives, the Rules provide no conceivable mechanism to ensure a disinterested adjudicator.

After all, Alpine has been interfacing with DTCC representatives in its discussions regarding the ENC requirements.

109.   And, taking into account also that the costs of the hearing may be charged to the member, if it loses, NSCC Rules & Procedures Rule 37 § 4, the entire process is designed to discourage the member from challenging Defendants' allegations and decision to take adverse action against the member.

110.   Defendants hold significant power over market participants, yet fail to abide by the Constitutional mandates and protections that serve to limit agency action and preserve the critical and constitutional rights of those subject to its authority.

111.   Where, as here, Congress has sought to outsource governmental powers to (purportedly) private actors who are supposedly not bound by the Constitution, current Supreme Court justices have found the approach impermissible, stating that the Government must remain accountable to the public and "cannot delegate regulatory authority to a private entity." *Texas v. Comm'r of Internal Revenue*, 142 S.Ct. 1308 (2022) (Alito, J., joined by Thomas, J. and Gorsuch).

112.   Defendants' combination of legislative and adjudicative functions – with Defendants' representatives serving as judge, jury and executioner – renders their enforcement actions unconstitutional.

**VI.    A Declaration and Injunction from this Court is the Only Remedy Available to Check Defendants' Unconstitutional Exercise of Power.**

113.    Defendants have been given enormous governmental power to control access to and operations of the nation's securities markets, despite purporting to be private entities.

114.    Defendants' existence and structure violates the Constitution.

115.    Alpine will be irreparably harmed if Defendants are permitted to continue to utilize their unconstitutional structure and proceedings to pursue their efforts to imposes greater and greater financial barriers to access the nation's security markets and deprive Alpine and its owners and employees of their right and ability to continue to operate in their chosen business and professions.

116.    This Court is the only forum that affords the opportunity for relief.

<u>COUNT I</u>
**(Violation of the Separation of Powers)**

117.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

118.    The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

119.   Recognizing the impossibility of one person performing all business of the government, the Constitution provides for principal executive officers to assist in these duties.

120.   The President is empowered to keep such principal officers accountable by removing them from office, if necessary.

121.   As set forth above, Defendants, individually and/or collectively, are governmental actors and instrumentalities exercising wide-ranging executive power. including the unchecked governmental power and authority on behalf of the SEC to control the functioning of the nation's securities markets and restricting access thereto to by, *inter alia,* rulemaking and imposition significant and ever increasing capital requirements on broker-dealer members of NSCC, including Alpine, which in turn serve a barriers to access the markets by both traders and issuers; to enact wide-ranging rules and regulations; to conduct investigations and disciplinary proceedings; and to impose sanctions and deprive access to essential securities clearing and settlement services.

122.   Defendants' wide-ranging exercise of executive power is immune from Presidential supervision or control.

123.   Defendants' joint and overlapping Board is not appointed or removable by the President.

124.   The SEC is charged with overseeing NSCC, but NSCC's Board, executives, and officers, which it shares with DTCC, are insulated from the SEC's control. The SEC cannot remove Defendants' Board members at-will, and may not

be able to remove DTCC's Board members, executives or officers at all. Instead, the SEC may remove NSCC Board members only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

125.   The SEC commissioners cannot be removed by the President except for in limited circumstances.

126.   As a result, Defendants' Board members, along with its executives and officers, are afforded multi-level protection from removal thus impeding the President's ability to oversee the officers executing the laws of the United States in violation of the Constitution's separation of powers.

## COUNT II
### (Violation of the Appointments Clause of the U.S. Constitution)

127.   Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

128.   For the reasons detailed above, Defendants are and/or function as public entities, agencies and/or instrumentalities of the United States subject to the constraints imposed on the federal government by the Constitution.

129.   Because Defendants are governmental actors, agencies and/or instrumentalities of the United States, and because, as described in the preceding paragraphs, their Board exercises significant authority pursuant to the laws of the

United States and are therefore officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution.

130.   The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., Art II, § 2, cl. 2.

131.   By virtue of their wide-ranging discretion, duties, functions and independence, members of the Board and Defendants' executives and officers are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate. Accordingly, the selection of the Defendants' Board by its membership, and, upon information and belief, the Board's corresponding selection of executives and officers, violates the Appointments Clause.

132.   In the alternative, the members of Defendants' Board and Defendants' executives and officers are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because Defendants are not a department within the meaning of the Clause, the appointment of Defendants' Board and executives and officers violates the Appointments Clause.

## COUNT III
### (Unconstitutional Delegation)

133.   Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

134.   The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1

135.   The grant of wide-ranging authority which the SEC delegated to and which is enjoyed by DTCC and NSCC improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch.

136.   This delegation is unconstitutional if Defendants' Board is deemed part of the federal government and is even more problematic if the Defendants and their Board are deemed to be a private entity.

137.   To the extent DTCC and its board wields delegated governmental authority through NSCC, but is not itself a regulated registered clearing agency or SRO, the delegation is facially unlawful.

## COUNT IV
### (Violation of the Fifth Amendment)

138.   Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

139.   Due Process of Law requires a fair trial in a fair and unbiased tribunal.

140.   Section 17A of the Exchange Act requires that the rules of the clearing agency "provide a fair procedure with respect to disciplining of participants, the

denial of participation to any person seeking participation therein, and the prohibition or limitation by the clearing agency of any person with respect to access to services offered by the clearing agency." 15 U.S.C. § 78q-1(b)(3)(H).  However, NSCC's rules provide no such procedure.

141.   As described above, NSCC's rules are vague, biased, secretive and fail to implement any procedures that maintain the integrity of the proceedings.

142.   By disciplining and taking substantial rights, including the right to earn a living, from broker-dealer members, like Alpine, through such unfair process, NSCC and/or DTCC, by and through NSCC, are violating the Due Process Clause of the Fifth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for the following relief:

1.   An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that NSCC and/or DTCC are state actors obligated to respect the rights guaranteed under the United States Constitution;

2.   An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that NSCC and/or DTCC are presently constituted and operating in a manner that violates the Constitution;

3.   An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that NSCC's disciplinary proceedings are unlawful and unconstitutional, specifically including, but not limited to, as applied to Alpine.

4.      An order and judgment enjoining Defendants from maintaining their unconstitutional governance and continuing its unlawful and unconstitutional operation, specifically including, but not limited to, imposing the new ENC requirement of $10 million on Alpine.

5.      An order and judgment enjoining Defendants from continuing their unlawful and unconstitutional disciplinary proceedings, specifically including, but not limited to, taking adverse action against Alpine, and imposing the new ENC requirements on Alpine;

6.      Costs and attorneys' fees pursuant to any applicable statute or authority; and

7.      Such further relief as this Court deems just and appropriate.


Dated this 27th day of October, 2023

*/s/ Aaron D. Lebenta*
Aaron D. Lebenta (10180)
CLYDE SNOW & SESSIONS, P.C.
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Tel/Fax: 801.322-2516
adl@clydesnow.com

Maranda E. Fritz (pro hac vice to be filed)
MARANDA E. FRITZ, P.C.
521 Fifth Avenue, 17th Floor
New York, New York 10175
Telephone: 646.584.8231
maranda@fritzpc.com