IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL SECURITIES CLEARING CORPORATION, and THE DEPOSITORY TRUST & CLEARING CORPORATION,<br><br>Defendants,<br><br>UNITED STATES OF AMERICA,<br><br>Defendant-Intervenor. | MEMORANDUM DECISION & ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION<br><br>Case No. 2:23-cv-00782-JNP-JCB<br><br>District Judge Jill N. Parrish |

In this action, Alpine Securities Corporation ("Alpine") seeks relief from adjudicatory actions and the enforcement of rules promulgated by the National Securities Clearing Corporation ("NSCC"), which is owned by the Depository Trust & Clearing Corporation ("DTCC") (collectively, "Defendants"). Before the court is Alpine's Motion for a Temporary Restraining Order and Preliminary Injunction. ECF No. 33 ("Motion" or "Mot."). For the reasons set out below, Alpine's Motion is **DENIED**.

## FACTUAL BACKGROUND

### A. Background and Procedural History

"Until 1975[,] stock sales involved delivery of the physical stock certificates to the buyer, typically through a web of brokers and dealers. As trading volumes increased and systems for

clearing and settling stock transactions multiplied, physical transfer of stock certificates became impractical." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 776 (8th Cir. 2009). As a result, in 1975, Congress added Section 17A to the Exchange Act, which directed the Securities and Exchange Commission ("SEC") to facilitate the establishment of a national system for the "prompt and accurate clearance and settlement of transactions in securities." 15 U.S.C. § 78q-1(a)(2)(A)(i), (e).

Section 17A also authorized the SEC to register and regulate clearing agencies. 15 U.S.C. § 78q-1(b). Any agency that wishes to operate as a registered clearing agency must meet certain statutory criteria, including the ability to "facilitate the prompt and accurate clearance and settlement of securities transactions" and to "safeguard securities and funds in its custody or control or for which it is responsible," as well as the provision of rules ensuring fair representation and competition. *Id.* § 78q-1(b)(3)(A).

Consistent with those criteria, the SEC requires clearing agencies to "establish, implement, maintain and enforce written policies and procedures reasonably designed to," among other things, "[e]ffectively identify, measure, monitor, and manage its credit exposures to participants" and "establish[] a risk-based margin system." 17 C.F.R. § 240.17Ad-22(e). This case involves one such self-regulatory agency ("SRO"), NSCC, which is empowered under the Exchange Act to "promulgate and enforce rules governing the conduct of its members." *Barbara v. New York Stock Exch. Inc.*, 99 F.3d 49, 51 (2d Cir. 1996).

   i)  NSCC and DTCC

DTCC is a non-public holding company that wholly owns, controls and operates through NSCC. NSCC is registered with the SEC as a clearing agency and an SRO. NSCC provides central counter-party clearance and settlement services, guaranteeing payment and delivery of securities

between its members for virtually all transactions in equities and other types of securities in the United States. *See Pet Quarters*, 559 F.3d at 776-77. NSCC has been a registered clearing agency since 1977, when the SEC initially approved its application for registration under section 17A of the Exchange Act. *See* 15 U.S.C. § 78q-1(b); *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1090 (D.C. Cir. 1978) (citing 42 Fed. Reg. 3916 (Jan. 13, 1977)).

As an SRO, NSCC both promulgates and enforces certain rules governing the conduct of its members, one of which is Alpine. *Barbara*, 99 F.3d at 51. Before any rules proposed by NSCC may be promulgated, after public notice and comment, proposed rules are reviewed by the SEC and approved only if it finds them "consistent with the requirements" of the Exchange Act and its implementing regulations. 15 U.S.C. § 78s(b); 15 U.S.C. § 78q-1(d)(1); 88 Fed. Reg. 84,454 (Dec. 5, 2023) (SEC final rule requiring clearing agencies to meet certain requirements and to adopt particular written policies and procedures with respect to governance).

The SEC can also, at any time, prescribe "such rules and regulations . . . as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter," and all registered clearing agencies must act in accordance with such rules. 15 U.S.C. § 78q-1(d)(1); 88 Fed. Reg. at 84,454. Further, the SEC may limit NSCC's activities and operations or suspend or revoke NSCC's registration "if in [the SEC's] opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the statute]." 15 U.S.C. § 78s(h)(1).

Regarding the enforcement of its rules governing member conduct, the NSCC is empowered to adjudicate certain issues regarding members' standing to access its services. In addition to its power to review and revise NSCC's proposed rules regarding membership, the SEC also has authority to review these adjudicatory decisions of NSCC hearing panels regarding

disciplinary actions or membership decisions. 15 U.S.C. § 78s(d) provides that any final disciplinary sanction imposed by an SRO on a member thereof "shall be subject to review by the appropriate regulatory agency." That provision also permits the SEC to stay any such sanction pending its review. The SEC's decisions regarding both SRO registration and SRO rules are final orders that may be subject to judicial review. *See Bradford Nat'l Clearing Corp.*, 590 F.2d at 1094 (citing 15 U.S.C. §§ 78s(b), 78y(a)(4)); *see also Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 444 (D.C. Cir. 2017).

DTCC and its subsidiary NSCC are private corporations, and the government does not appoint any of their directors, officers, or employees. *See, e.g.*, Board of Directors Charter art. III, https://perma.cc/7S4K-52VB (describing composition of DTCC's board of directors, which also oversees its subsidiaries, including NSCC and DTC); NSCC By-Laws, § 3.1, https://perma.cc/79GS-J29A (providing that NSCC officers are elected by the board of directors); 42 Fed. Reg. at 3924–25 (describing original composition of NSCC board of directors). NSCC receives no government funding; rather, its revenue is generated by its own operations, largely through fees charged for membership and clearing services. NSCC Rules & Procedures, add. A.

ii) Alpine

Alpine is a broker-dealer registered with the SEC and an NSCC Member based in Utah. Alpine's primary business for decades has been clearing liquidation (or sale-side) microcap or OTC stock transactions for itself and other firms, including for an affiliated company with the same ownership, Scottsdale Capital Advisors.

iii) The rule at issue

NSCC has historically held members that clear for others to more stringent regulatory requirements. On December 13, 2021, NSCC submitted a proposed rule to the SEC to increase the

minimum capital requirements applicable to such broker-dealer members, including Alpine. Alpine objected to the proposed rule change during the public notice-and-comment period. The SEC approved the proposed rule change on August 26, 2022 ("Rule Change"). It took effect on August 26, 2023, with a grace period of 60 days (until October 25, 2023).

Pursuant to the Rule Change, the minimum Excess Net Capital ("ENC") requirement of a broker-dealer is now based on (i) the broker-dealer's Clearing Status, either "Self-Clearing" or "Clears for Others," and (ii) the level of risk the broker-dealer presents to NSCC, as measured by its daily volatility component, as reflected by its "Value-at-Risk Tier," or VaR Tier, which is based on the volatility of a member's trading activity.

Alpine alleges that it reorganized its operations and no longer clears for other members and therefore should be considered self-clearing, which would subject it to lower minimum capital requirements. The parties dispute whether Alpine was obligated to meet the capital requirements under the new rule, and whether it in fact did so. The court declines to unnecessarily probe these issues, however, because they are tangential to the resolution of Alpine's motion.

      iv)    The instant action

Alpine filed this action on October 27, 2023, two days after the expiration of the Rule Change grace period. ECF No. 2. On November 9, 2023, Defendants issued to Alpine a "Notice of Intent to Cease to Act." Defendants advised Alpine that they had "determined to cease to act for Alpine, subject to Alpine's right to a hearing." According to the Notice, the determination was based on the conclusions that Alpine had not complied with the new ENC requirements and had submitted inaccurate ENC data.

On January 16, 2024, Defendants filed a motion to dismiss this action. ECF No. 27. On January 29, 2024, the United States intervened, as of right, for the limited purpose of defending

the constitutionality of the challenged provisions of the federal securities laws, which govern NSCC's relationship with the SEC. ECF No. 28; 28 U.S.C. § 2403(a). On November 12, 2023, Alpine requested a hearing before an NSCC hearing panel. On February 12, 2024, the panel set the hearing to commence in New York on March 18, 2024.

On February 20, 2024, Alpine filed this motion, seeking an order "enjoining Defendants from pursuing a pending disciplinary proceeding against Alpine, imposing sanctions and/or taking other adverse action against Alpine, pending resolution of this case on the merits. Alpine further requests that the Court issue an immediate interim TRO to stay Defendants' pending disciplinary action against Alpine until the issues raised in this Motion can be considered more fully at a preliminary injunction hearing." Mot. at 28. On February 21, 2024, Alpine filed its First Amended Complaint. ECF No. 36.

### B. Findings of Fact

1. Neither DTCC nor NSCC were created by the government.
2. The government appoints no director, officer, or employee of the DTCC or NSCC.
3. NSCC receives no government funding.

## LEGAL STANDARD

To show an entitlement to preliminary injunctive relief under FED. R. CIV. P. 65, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

"Under *Winter*'s rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Diné Citizens Against*

6

*Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). At bottom, "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

## ANALYSIS

I.   **Jurisdiction (Alpine's Due Process Claim)**

Under its fourth claim for relief, Alpine argues that the expedited disciplinary proceeding to which it is subject violates or will violate Alpine's due process rights under the Fifth Amendment. Alpine argues that the "corporate death penalty" hangs in the balance, and the adjudicatory panel lacks "even the most basic appearance of impartiality." Mot. at 25. This court, however, lacks jurisdiction to hear this claim.

The United States Supreme Court has recognized that "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter. v. FTC*, 143 S. Ct. 890, 900 (2023). This is likely such a case. Because Alpine's fourth claim may be jurisdictionally defective, the court addresses it before turning to the likelihood of success of Alpine's remaining claims, which the court addresses on their merits.

> Congress [] may substitute for [typical] district court authority an alternative scheme of review. Congress of course may do so explicitly, providing in so many words that district court jurisdiction will yield. But Congress also may do so implicitly, by specifying a different method to resolve claims about agency action. The method Congress typically chooses is the one used in both the Exchange Act and the FTC Act: review in a court of appeals following the agency's own review process. We have several times held that the creation of such a review scheme for agency action divests district courts of their ordinary jurisdiction over the covered cases.

*Id*.

As in *Axon Enterprise*, the instant action involves the Exchange Act. 15 U.S.C. § 78s(d) provides that any final disciplinary sanction imposed by an SRO on a member thereof "shall be subject to review by the appropriate regulatory agency." That provision also permits such sanctions to be stayed pending review by the SEC.

15 U.S.C. § 78y(a) further provides that persons aggrieved by final orders of the SEC "may obtain review of the order in the United States Court of Appeals." The Court of Appeals, "on whatever conditions may be required and to the extent necessary to prevent irreparable injury, may issue all necessary and appropriate process to stay the order or rule or to preserve status or rights pending its review." *Id*. § 78y(c)(2).

As the Supreme Court has made clear, this opportunity for eventual appellate review is of profound consequence in the court's jurisdictional analysis. In *Thunder Basin*, the Supreme Court held that the Federal Mine Safety and Health Amendments of 1977 channeled pre-enforcement challenges to that Act to the jurisdiction of the Federal Mine Safety and Health Review Commission, effectively divesting federal district courts of jurisdiction over certain related claims. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202-04 (1994).

As is relevant here, one such claim expressly considered by the *Thunder Basin* Court was a challenge asserting that the mandated statutory-review process itself violated the Due Process Clause of the Fifth Amendment. The Supreme Court, however, affirmed the Tenth Circuit's decision to vacate the district court's finding that the agency lacked expertise to determine the plaintiff's Due Process claim. *See Thunder Basin Coal Co. v. Martin*, 969 F.2d 970, 973 (10th Cir. 1992), *aff'd*, 510 U.S. at 200. The Court stated that the relevant Commission had addressed constitutional questions in previous enforcement proceedings and, even if it had not, petitioner's claims could be meaningfully addressed in the Court of Appeals. *Thunder Basin*, 510 U.S. at 215.

8

The Supreme Court, in *Free Enterprise Fund*, affirmed that *Thunder Basin* provides the relevant rule of decision, and restated the three factors to be considered as the court measures its own jurisdiction: (1) whether "a finding of preclusion could foreclose all meaningful judicial review"; (2) whether the suit is "wholly collateral to a statute's review provisions"; and (3) whether the claims are "outside the agency's expertise." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489-90 (2010).

In *Free Enterprise Fund*, the court determined that, under *Thunder Basin*, federal districts courts have jurisdiction over structural-constitutional claims like the ones raised in Alpine's first two claims for relief. However, nothing in *Free Enterprise Fund* disturbs the *Thunder Basin* Court's holding that Due Process claims may be appropriately channeled through administrative adjudicative bodies in cases where appellate review in federal courts is eventually available.

This concept was reaffirmed in *Axon Enterprise*, which again applies the *Thunder Basin* factors, 143 S. Ct. at 900-901, and holds that challenges "to the structure or very existence of an agency," or challenges that an agency is "wielding authority unconstitutionally in all or a broad swatch of its work" are not channeled to the exclusive jurisdiction of an agency's adjudicatory system. *Id*. at 902.

Like *Free Enterprise Fund*, *Axon Enterprise* neither held nor suggested that *Thunder Basin*'s decision to allow Due Process claims to be channeled through an agency's adjudicatory program (later to be reviewed by federal courts) should be reconsidered. As in *Axon Enterprise*, Alpine can eventually "obtain review of [its] constitutional [Due Process] claims through an appeal from an adverse agency action to a court of appeals." 143 S. Ct. at 903; *accord Thunder Basin*, 510 U.S. at 215 ("The Commission has addressed constitutional questions in previous enforcement proceedings. Even if this were not the case, however, petitioner's statutory and constitutional

9

claims here can be meaningfully addressed in the Court of Appeals."); *Jarkesy v. SEC*, 803 F.3d 9, 18 (D.C. Cir. 2015) ("[S]o long as a court can eventually pass upon the challenge, limits on an agency's own ability to make definitive pronouncements about a statute's constitutionality do not preclude requiring the challenge to go through the administrative route.") (citing *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 17 (2012)).

Contrary to Alpine's arguments, the nature of constitutional claims asserted is of great significance in jurisdictional determinations—not all claims brought under the Constitution provide a workaround to Congress's jurisdiction-channeling decisions. Similarly, this court is obliged to ensure it has jurisdiction as to each of Alpine's claims. The mere fact that asserts some structural-constitutional claims (over which this court has jurisdiction under *Thunder Basin* and *Axon Enterprises*) does not mean this court can hear its claim under the Fifth Amendment (over which this court has been divested of jurisdiction by congressional design).

Here, a finding of jurisdictional preclusion as to Alpine's Due Process claim would not foreclose all meaningful judicial review. That claim—challenging the particular procedures of Defendants' disciplinary hearing—is not wholly collateral to the statute's review provisions. And even if the Defendants' adjudicatory panel and the SEC have no experience addressing similar Due Process claims, "petitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals." *Thunder Basin*, 510 U.S. at 215. Further, Alpine's Due Process claim is not directed to the structure or very existence of an agency," nor does it meaningfully challenge that Defendants are "wielding authority unconstitutionally in all or a broad swatch of its work." *Axon Enterprise*, 143 S. Ct. at 900-902.

Even if Alpine were able to show that Defendants were engaged in state action and thus subject to Due Process constraints, it fails to show that it is likely to prevail on the merits of its

10

Due Process claim because this court probably lacks jurisdiction as to that claim in the first place. *Accord Alpine Sec. Corp. v. Fin. Indus. Regulatory Auth.*, 2021 U.S. Dist. LEXIS 170482, at *14 (D. Utah Sep. 7, 2021) (dismissing Alpine's Due Process claim against FINRA for lack of jurisdiction under the Exchange Act).

**II.      Likelihood of Success on the Merits (Alpine's Remaining Claims)**

As to Alpine's remaining claims, in order to warrant the issuance of preliminary injunctive relief, a plaintiff must demonstrate that it has a "strong likelihood of success on the merits." *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1253 (10th Cir. 2018). In making this determination, courts consider "the evidence plaintiff intends to present at trial." *Id.*

Here, Alpine argues that it has shown a likelihood of success on the merits because Defendants wield significant governmental power, which subjects them to the structural rigors of Article II of the United States Constitution, further demanding that the Defendants' disciplinary proceedings comply with the constitutional demands of Due Process.

The court begins by turning to Alpine's first two claims, which relate to the constitutionality of Defendants' structure, which the court refers to as Alpine's structural-constitutional arguments. Specifically, Alpine argues that the Defendants are unconstitutionally structured under the Appointments Clause of Article II and the related principle of the President's Removal Power. The court then considers Alpine's arguments regarding its third claim for relief, in which it asserts that the authority delegated to Defendants violates the constitutional nondelegation doctrine. For the reasons set out below, the court ultimately concludes that Alpine has not demonstrated a likelihood of success on any of the three claims asserted in its Amended Complaint over which this court has jurisdiction.

### A. Appointment and Removal

Plaintiff's first and second claims turn on the Constitution's structural provisions regulating how parts of the government must be organized in order to be germane to the President's ultimate authority as Chief Executive. That is, the Constitution imposes certain restrictions on certain Officers of the United States, dictating who appoints such officers and when they can be removed by the President. Whether these structural considerations are at play turns on whether an institution is part of the government. It does not turn on the broader, somewhat more nebulous question of whether an institution engages in "state action." *See Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017).

In short, the "Appointments Clause says nothing" about any person other than Officers of the United States. *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020). Even if an entity engages, at times, in state action, unless it is part of the government and is headed by an Officer of the United States, resort to the Appointments Clause is *non sequitur*. Because the President's removal power is incident to the power of appointment, the same is true with regard to Alpine's arguments surrounding removability. *Free Enter. Fund*, 561 U.S. at 509; *Myers v. United States*, 272 U.S. 52, 119 (1926); *Ex parte Hennen*, 38 U.S. 230, 259 (1839).

The question this court must resolve in determining whether Alpine is likely to succeed on the merits of its two structural constitutional claims is whether Defendants are part of the government. The test to answer this question lies in the Supreme Court's opinion in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). *Lebron*, in turn, relies on the consideration of multiple factors: "[(1)] the Government creates [the] corporation by special law, [(2)] for the furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint

12

a majority of the directors of that corporation." *Fannie Mae*, 861 F.3d at 167 (citing *Lebron*, 513 U.S. at 399-400).

That *Lebron* provides the relevant rule of decision is confirmed by the Supreme Court's reliance on that opinion (and the test it sets out) in the recent cases of *Free Enterprise Fund*, 561 U.S. at 485, and *DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 53-54 (2015). Alpine fails to show, however, under any factor set out in *Lebron*, that Defendants are part of the government. Neither could Alpine succeed in such an argument. After all, Defendants were undisputedly not created by the government, and the government retains no authority to appoint any portion of their Boards.

The model of private SROs set out under the Exchange Act has previously been cited by the Supreme Court as an archetype of private entities. Indeed, the Supreme Court has referred to SROs under the Exchange Act to illustrate a quintessentially, archetypically private entity in a case considering appointment and removal. "Unlike the self-regulatory organizations, however, the [Public Company Accounting Oversight] Board," at issue in that case, "is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry." *Free Enterprise Fund*, 561 U.S. at 485. As a result of these facts, the Court cited to *Lebron* in declaring that the PCAOB is "part of the government" for the purposes of the structural-constitutional considerations. *Id*. at 486.

Alpine's arguments center on whether the Defendants are engaged in state action: it argues that nominally private institutions engage in state action "when a private party acts as an agent of the government in relevant respects." *NB v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015). It reasons that where private parties and governmental actors are "joint participant[s] in [an] enterprise," *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357-58 (1974), or where private parties are "entwined with governmental policies or when government is entwined in [the] management

13

or control" of private parties, *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001), a nominally private actor is, in reality, a state actor.[1]

In so arguing, however, Alpine asserts the incorrect standard and relies on a faulty presumption. Whether an entity is subject to the structural-constitutional demands of appointment and removal does not turn on the presence of state action, as Alpine argues, but rather on whether the entity is "part of the government" under *Lebron*.

No case cited by Alpine in its memoranda is directed towards the structural-constitutional issues of appointment or removal. Instead, the cases it cites involve the alleged violation of individual rights under, for example, the First, Fifth, and Fourteenth Amendments. *E.g.*, *Brentwood*, 531 U.S. at 293; *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995); *Rooms v. SEC*, 444 F.3d 1208, 1210 (10th Cir. 2006); *NB v. District of Columbia*, 794 F.3d 31, 35 (D.C. Cir. 2015); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 165 (1972).[2]

---

[1] Alpine also argues that "[s]tate action is also present when a private party performs a 'public function' of the sort traditionally performed only by the government." Mot. at 18-19. Such state action, Alpine argues, can also be seen where nominally private actors act as "quasi-governmental agenc[ies]" with "quasi-governmental authority to adjudicate actions against members." *NASD v. SEC*, 431 F.3d 803, 804-05, 807 (D.C. Cir. 2005). Alpine looks, for example, to the determination of the D.C. Circuit in *Blount v. SEC* that a rule promulgated by the Municipal Securities Rulemaking Board ("MSRB") was "government action of the purest sort." *Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995).

[2] While Alpine represented at oral argument that *Blount* involved questions of appointment and removal, that is not so. *Blount* turned on the First and Tenth Amendments, and neither the Appointments Clause nor the related issue of the President's removal powers were not at issue in *Blount*. *See generally* 61 F.3d 938.

Further, *United States v. Ackerman*, which Alpine cites in reply, reaffirms that *Lebron* provides the relevant rule for determining whether a nominally private organization is part of the government. 831 F.3d 1292, 1297-98 (10th Cir. 2016).

While the question of state action may be relevant, for example, to the question of due process, it does not govern the applicability of the structural concerns of appointment and removal. Even where private actors engage in state action, the Constitution's appointment and removal demands have nothing to say about them because, state action notwithstanding, they are not "part of the government." *Kim v. Fin. Indus. Regul. Auth.*, 2023 U.S. Dist. LEXIS 180456, at *23 n.12 (D.D.C. Oct. 6, 2023); *Aurelius*, 140 S. Ct. at 1658; *NB*, 794 F.3d at 43.

Because Alpine has failed to demonstrate any likelihood of success on the merits of its arguments as they relate to its structural-constitutional challenges, and instead directs its argument to the incorrect standard, it has failed to show any entitlement to preliminary injunctive relief under FED. R. CIV. P. 65.

### B. Nondelegation

Alpine's third claim is pleaded under the nondelegation doctrine. The non-delegation doctrine arises from Article I of the Constitution, which provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art I., § 1. Alpine argues that Defendants' exercise of authority violates the nondelegation doctrine whether or not Defendants are considered part of the government for purposes of its structural-constitutional claims.

      i)      Interbranch delegation

First, even if, *arguendo*, Defendants are properly considered part of the government, Alpine has failed to show any likelihood of success on its argument that Defendants wield legislative

authority in excess of nondelegation principles.[3] It is in this context of delegations of legislative authority between parts of the government that the nondelegation doctrine typically arises: "The non-delegation doctrine provides 'that Congress may not constitutionally delegate its legislative power to another branch of government.'" *United States v. Brown*, 348 F.3d 1200, 1216 (10th Cir. 2003) (quoting *Touby v. United States*, 500 U.S. 160, 165 (1991)).

But delegation, by itself, is not suspect under existing precedent. In fact, most such delegations of authority are upheld. *See Gundy v. United States*, 139 S. Ct. 2116, 212 (2019) (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)) ("Only twice in this country's history (and that in a single year) have we found a delegation excessive—in each case because Congress had failed to articulate any policy or standard to confine discretion. By contrast, we have over and over upheld even very broad delegations.") (quotation omitted). "[T]he Constitution does not deny[] to the Congress the necessary resources of flexibility and practicality [that enable it] to perform its function[s]." *Gundy*, 139 S. Ct at 2123 (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944)).

The nondelegation test is thus limited to a search for an "intelligible principle" laid down by Congress guiding agency enforcement and interpretation. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001). As black-letter law now stands, the nondelegation doctrine is a tremendously low hurdle for Congress to clear. The Supreme Court has approved delegations to

---

[3] Although Alpine's third claim contemplates both traditional interbranch nondelegation concerns *and* the private nondelegation doctrine, its motion only directs argument to the private nondelegation doctrine. For this reason, the court is of the view that Alpine failed to carry its burden of justifying preliminary injunctive relief by failing to adequately brief its traditional interbranch nondelegation argument. In the interests of fairness, however, the court addresses the issue, but only briefly.

"regulate in the public interest," "set fair and reasonable prices," "set just and equitable rates," and "issue whatever air quality standards are requisite to protect the public health." *Gundy*,139 S. Ct at 2123 (cleaned up) (collecting cases).

The court is satisfied that, for the purposes of a probabilistic determination under Rule 65, the Exchange Act lays down an intelligible principle guiding agency enforcement and interpretation.

          ii)        Private delegation

In the event that Defendants are not part of the government, Alpine argues that a nondelegation problem arises under the so-called private nondelegation doctrine. That doctrine "addresses the Constitution's bar on the government's delegation of unchecked legislative power to private entities." *Consumers' Rsch. v. FCC*, 63 F.4th 441, 450 (5th Cir. 2023) (cleaned up); *accord Consumers' Rsch. v. FCC*, 88 F.4th 917, 925 (11th Cir. 2023).

Delegations of authority to private entities are lawful where the private entity "function[s] subordinately to" the agency while aiding the agency and the agency "has authority and surveillance over the activities of" the private entity. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940); *Texas v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021*), cert. denied sub nom. Texas v. Comm'r*, 142 S. Ct. 1308 (2022); *Consumers' Rsch.*, 88 F.4th at 925-26.

While Alpine's Motion concedes that Defendants' "combined functions are subject to SEC oversight," it nonetheless argues that Defendants' determination that Alpine "clears for others" lacks sufficient SEC oversight. Mot. at 30. But Defendants' classification decision is, in fact, subject to review by the SEC through the adjudicatory appeal process outlined above. The supposed lack of oversight that Alpine complains of is a function of time: Alpine will be able to submit any sanctions imposed by Defendants to SEC review and oversight. The fact that it hasn't

17

yet been able to do so does not give rise to a private nondelegation problem. *See Oklahoma v. United States*, 62 F.4th 221, 243 (6th Cir. 2023) (Cole, J., concurring) (citing *Sartain v. SEC*, 601 F.2d 1366, 1371 n.2 (9th Cir. 1979), and *Sorrell v. SEC*, 679 F.2d 1323, 1326 (9th Cir. 1982)). Further, as addressed above, Alpine can move to stay any sanctions imposed by Defendants pending review by both the SEC and the United States Court of Appeals.

The public-private regulatory regime created by the Exchange Act has repeatedly been upheld against private nondelegation challenges and elsewhere cited as an example of a constitutionally permissible arrangement. "In case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Oklahoma*, 62 F.4th at 229 (citing *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012-13 (3d Cir. 1977); *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982); *see also Ass'n of Am. R.R. v. United States DOT*, 721 F.3d 666, 671 n.5 (D.C. Cir. 2013) (describing the SROs' role as "purely advisory or ministerial")); *accord Gen. Bond & Share Co. v. SEC*, 39 F.3d 1451, 1453 (10th Cir. 1994); *Calif. Pub. Emples.' Ret. Sys. v. N.Y. Stock Exch., Inc. (In re NYSE Specialists Sec. Litig.)*, 503 F.3d 89, 102 (2d Cir. 2007); *Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013).

Alpine fails to meaningfully argue that the SEC lacks ongoing authority and surveillance over Defendants' activities and has therefore failed to demonstrate a likelihood of success on its private nondelegation argument.

### III.  Remaining Elements

Alpine has failed to show a likelihood of success on the merits, and has certainly fallen short of its obligation to, by a clear showing, carry the burden of persuasion. *Mazurek*, 520 U.S. at

972. As a result, it has failed to establish the first of four necessary elements of the conjunctive test for Rule 65 preliminary injunctive relief. *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits[.]"); *accord Diné Citizens*, 839 F.3d at 1281-82.

As a result, the court need not proceed any further to consider Alpine's arguments regarding harm, the balance of the equities, or the public interest. However, it notes that it is nevertheless of the opinion that the public interest weighs clearly against the issuance of an injunction in Alpine's favor. Like the United States District Court for the District of Columbia, the court understands that interfering in markets presents a real threat to the security and confidence of American securities markets and investor confidence. *Kim*, 2023 U.S. Dist. LEXIS 180456, at *6.

## CONCLUSION & ORDER

For the foregoing reasons, the motion of Alpine Securities Corporation for a Temporary Restraining Order and Preliminary Injunction, ECF No. 33, is **DENIED**.

DATED March 8, 2024.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge