IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL SECURITIES CLEARING CORPORATION, THE DEPOSITORY TRUST & CLEARING CORPORATION, and THE DEPOSITORY TRUST COMPANY,<br><br>Defendants,<br><br>UNITED STATES OF AMERICA,<br><br>Defendant-Intervenor. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:23-cv-00782-JNP-JCB<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

Before the court is a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants National Securities Clearing Corporation ("NSCC"), the Depository Trust & Clearing Corporation ("DTCC"), and the Depository Trust Company ("DTC") (collectively, "Defendants"). ECF No. 64 ("Defs.' Mot."). Plaintiff Alpine Securities Corporation ("Plaintiff" or "Alpine") filed this action, alleging constitutional violations and seeking relief from adjudicatory actions and enforcement of rules promulgated by NSCC and DTC, subsidiaries of DTCC. ECF No. 36 ("Pl.'s Am. Compl."). Because Plaintiff challenges the constitutionality of federal securities laws, the United States intervened on behalf of Defendants under Federal Rules of Civil Procedure 5.1(c) and 24(a)(1). ECF No. 28. For reasons set forth herein, Defendants' motion to dismiss is GRANTED. The court dismisses Plaintiff's due process claim WITHOUT PREJUDICE and Plaintiff's remaining claims WITH PREJUDICE.

## BACKGROUND

As self-regulatory organizations ("SROs"), clearing agencies have been a fixture of the U.S. market since Congress passed Section 17A of the Securities Exchange Act (the "Act" or "Exchange Act") in 1975. Clearing agencies facilitate the clearing and settlement process that is essential to the operation of the securities market.

> When investors agree to trade an equity security, the purchaser promises to deliver cash to the seller and the seller promises to deliver the security to the purchaser. The process by which the seller receives payment and the buyer, the securities, is known as clearance and settlement. To reduce risks and increase efficiency in the market . . . trades in equities and other securities are typically cleared and settled through registered clearing agencies such as NSCC.

ECF No. 30 ("United States Memo of Law"), at 2 n.1 (internal quotation marks omitted).

Defendants NSCC and DTC, subsidiaries of DTCC, are two of several private clearing agencies registered with the Securities and Exchange Commission ("SEC"). *See* U.S. SEC. AND EXCHANGE COMM'N, *Self-Regulatory Organization Rulemaking* (Nov. 7, 2024), https://www.sec.gov/rules/sro. These private clearing agencies provide settlement and clearing services to their members, including Alpine.

Prior to the passage of Section 17A, the act of clearing and settling a security transaction "involved delivery of the physical stock certificates to the buyer, typically through a web of brokers and dealers." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 776 (8th Cir. 2009). As one might expect, this process became inefficient and progressively challenging as transactions increased in volume. As a result, Congress passed Section 17A, directing the SEC "to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities." 15 U.S.C. § 78q-1(a)(2)(A)(i).

Thus, Section 17A spawned SEC regulation and oversight of various private entities that operate as clearing agencies. Today, clearing agencies provide a critical risk management function for the securities industry. Subject to SEC supervision, clearing agencies promulgate and enforce their own rules for their members to ensure the reliable and efficient transfer of securities in the financial market.

I.  **SEC OVERSIGHT OF CLEARING AGENCIES**

Under the Act, the SEC has the authority to register and regulate clearing agencies in accordance with statutory criteria enacted by Congress. *Id*. § 78q-1(b)(3). To register, a clearing agency must have the ability to "facilitate the prompt and accurate clearance and settlement of securities transactions" and to "safeguard securities and funds in its custody or control or for which it is responsible." *Id*. § 78q-1(b)(3)(A). In addition to registration requirements, the SEC has promulgated other regulations consistent with Section 17A, including a requirement that clearing agencies establish policies and procedures to "[m]aintain a sound risk management framework." 17 C.F.R. § 240.17ad-22(e)(3).

The SEC also reviews any rules promulgated by clearing agencies. Prior to promulgation, each rule proposed by a clearing agency must undergo public notice and comment and review by the SEC. 15 U.S.C. § 78s(b)(1). The SEC may approve a proposed rule only if it finds the rule "consistent with [the] requirements" of the Exchange Act and its implementing regulations. *Id.* § 78s(b)(2)(C). The SEC's decisions regarding both proposed rules and clearing agency registrations are subject to judicial review. *See Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1094.

Clearing agencies must also comply with any rules prescribed by the SEC "as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of

the purposes of [the Exchange Act]." 15 U.S.C. § 78q-1(d)(1). The SEC may limit a clearing agency's activities and operations or suspend or revoke its registration "if in [the SEC's] opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the statute]." *Id.* § 78s(h)(1). Finally, the SEC has authority to review any adjudicatory actions taken by a clearing agency, including any disciplinary action taken against a member. *Id.* § 78s(d).

## II.   THE RULE AT ISSUE AND PROCEDURAL HISTORY

One way in which NSCC manages risk in accordance with SEC regulations is through Excess Net Capital ("ENC") requirements for its members. This requirement ensures members maintain a buffer to absorb potential losses. If a member is unable to meet this obligation, NSCC can levy disciplinary action against the member, including terminating services for that member. In turn, clearing agencies are required by the SEC to ensure members comply with rules such as ENC requirements to prevent default and mitigate financial vulnerability.

In 2023, NSCC changed the ENC calculation through the promulgation of a rule (the "ENC Rule"). Pursuant to the rule, NSCC bases each member's ENC obligation on (i) the member's clearing status, either "Self-Clearing" or "Clears for Others," and (ii) the level of risk the member presents to NSCC. The SEC approved the ENC Rule and set an effective date of August 26, 2023, with a 60-day grace period for members to comply.

After the ENC Rule's grace period expired, Plaintiff filed this action in the District of Utah. Plaintiff alleges that the new ENC Rule skyrocketed their capitalization requirement from $1 million to $10 million, an effect that discriminates against smaller broker-dealer firms like Plaintiff. On November 9, 2023, NSCC and DTC sent a "Notice of Intent to Cease to Act," advising Plaintiff that they would terminate its membership, subject to a hearing. In the Notice,

Defendants reasoned that Plaintiff failed to comply with the new ENC Rule and submitted inaccurate ENC data.

In February 2024, Plaintiff moved for a temporary restraining order and preliminary injunction to enjoin Defendants from pursuing disciplinary action against it. The court subsequently denied Plaintiff's motion. ECF No. 51 ("Order Denying TRO"). In March 2024, DTCC held a hearing after which it affirmed its subsidiaries' decision to cease to act for Plaintiff and terminate its membership. Plaintiff requested SEC review of Defendants' decision, as well as a stay of Defendants' decision pending that review. On May 14, 2024, the SEC granted an administrative stay pending its decision on Plaintiff's motion to stay.

The operative complaint, amended in February 2024, alleges four separate claims for violation of (1) the separation-of-powers doctrine, (2) the Appointments Clause, (3) the nondelegation doctrine, and (4) the Due Process Clause of the Fifth Amendment. *See* Pl.'s Am. Compl. Plaintiff also seeks declaratory relief that Defendants are state actors subject to constitutional requirements and that their organization and operation as well as the new ENC Rule and associated disciplinary proceedings are unconstitutional. Defendants moved to dismiss all of Plaintiff's claims, arguing that the court lacks subject matter jurisdiction and Plaintiff failed to state a claim upon which relief can be granted.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a court may dismiss an action for lack of subject matter jurisdiction. The issue of subject matter jurisdiction can be raised at any time in the litigation process, and a district court *must* dismiss an action "[i]f it determines . . . that it lacks subject-matter jurisdiction." FED. R. CIV. P. 12(h)(3). Because the federal courts are courts of limited jurisdiction, "[t]he party invoking the jurisdiction of the court has the duty to establish

that federal jurisdiction does exist . . . ." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). Thus, Plaintiff bears the burden of proof.

The court may also dismiss any action that fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In evaluating a motion to dismiss under Rule 12(b)(6), the court takes the plaintiff's well-pleaded facts as true, drawing all inferences in the plaintiff's favor. *See Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's [] complaint alone is legally sufficient to state a claim for which relief may be granted." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (internal quotation marks omitted).

## ANALYSIS

The court first considers its subject matter jurisdiction over Plaintiff's due process claim. Although all of Plaintiff's claims appear to be based on federal questions, some statutory schemes in administrative law cases may deprive the court of jurisdiction over certain claims. Thus, the court considers whether such a statutory scheme applies here.

The court then turns to address whether Plaintiff stated a legally sufficient claim under the separation-of-powers doctrine, Appointments Clause, and nondelegation doctrine.

### I. SUBJECT MATTER JURISDICTION: DUE PROCESS

Defendants argue that the court lacks subject matter jurisdiction over Plaintiff's due process claim because the Exchange Act provides an alternative review scheme. "A special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter. v. FTC*, 598 U.S. 175, 185 (2023). To determine whether a statutory scheme deprives the district courts of jurisdiction, courts consider

the three factors outlined in the Supreme Court's decision in *Thunder Basin*: "First, could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim? Next, is the claim 'wholly collateral to [the] statute's review provisions'? And last, is the claim 'outside the agency's expertise'?" *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)).

In *Axon*, the Supreme Court noted that the Exchange Act does provide such a scheme that may preclude district court jurisdiction. *Id.* ("The agency effectively fills in for the district court, with the court of appeals providing judicial review."). But *Axon* held that the Exchange Act's statutory review scheme did not displace a district court's jurisdiction over claims challenging the constitutionality of the structure or existence of an agency. Thus, *Axon* distinguished constitutional structural claims from other claims. *See id.* at 177-78 (applying the *Thunder Basin* factors and concluding that they all weigh in favor of district court jurisdiction over structural constitutional challenges).

Specifically, the Court differentiated the claims in *Axon* from the due process claim asserted in *Thunder Basin*. Even though the due process constitutional challenge in *Thunder Basin* fell out of the agency's expertise, because "it could be meaningfully addressed in the Court of Appeals," the district court did not have jurisdiction over that claim. *Id.* at 177 (quoting *Thunder Basin*, 510 U.S. at 215). The Supreme Court contrasted this reasoning with that in *Free Enterprise Fund*, in which it held that an "Article II challenge to the structure of the Public Company Accounting Oversight Board—an agency regulating the accounting industry under the SEC's oversight—landed outside the Exchange Act's review scheme." *Id.* (referencing *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)).

Here, Plaintiff's first, second, and third claims resemble the claims asserted in *Axon* and *Free Enterprise Fund*. These claims relate to structural constitutional challenges, and the preclusion of district court jurisdiction where Congress provides a special statutory review scheme would not apply. But as the court previously concluded, the court does not have subject matter jurisdiction over Plaintiff's fourth claim for violation of the Due Process Clause of the Fifth Amendment. That claim is not a structural constitutional challenge, but rather more akin to the claim asserted in *Thunder Basin*. *See* Order Denying TRO at 10-11.

Still, Plaintiff urges the court to reconsider its reasoning, arguing that its due process claim is "intertwined with its structural constitutional claims because the Hearing Panel, which Alpine claims lacks the impartiality required for due process, is comprised of three of Defendants' Board Members. Defendants' Board is also the subject of Alpine's structural constitutional claims." Pl.'s Opp. at 28.

But even though the claims involve the same subject matter, they are two distinct claims. First, Plaintiff argues that it was not provided with an impartial hearing because the panel consisted solely of Defendants' board members who, by the nature of their board membership, could not provide impartiality. This is Plaintiff's claim under the Due Process Clause. And it is *this* claim over which the court lacks subject matter jurisdiction.

Separately, Plaintiff argues that the SEC does not provide adequate oversight over Defendants' board members. This is Plaintiff's third claim under the nondelegation doctrine, a structural constitutional challenge, that will be discussed in further detail below. This claim is similar to the claim in *Axon*, which alleged that "tenure protections of the agencies' ALJs render them insufficiently accountable to the President, in violation of separation-of-powers principles." *Axon*, 598 U.S. at 175. But this is not the claim over which the court lacks subject matter

jurisdiction. Although both claims, Plaintiff's due process claim and nondelegation doctrine claim, concern Defendants' board membership, the claims are distinct. And that distinction matters in terms of the court's subject matter jurisdiction.

Thus, the court is not persuaded by Plaintiff's argument that because the structural constitutional claim and the due process claim both concern Defendants' board, the claims are one and the same. Rather, they are two separate and distinct claims. "Subject matter jurisdiction . . . must be established in every cause under review in the federal courts." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015). Therefore, the court must establish jurisdiction over *each* individual claim, not a combination of claims, before proceeding to the merits.

Plaintiff also argues that *Axon* requires the court to consider its due process claim, but this argument flips the holding on its head. Indeed, *Axon* reaffirmed the court's earlier holding in *Thunder Basin* that a due process claim falls within the jurisdictional exclusion. *Axon* did not change the law. It revalidated the factors set forth in *Thunder Basin* and explained why a due process claim differs from a structural constitutional claim in terms of jurisdiction.

In applying the *Thunder Basin* factors, the court again determines that it does not have subject matter jurisdiction to evaluate Plaintiff's due process claim. First, applying the jurisdiction exclusion would not "foreclose all meaningful judicial review." *Thunder Basin*, 510 U.S. at 212-13. As *Axon* and *Thunder Basin* courts both noted, the court of appeals can adequately address Plaintiff's due process claim after SEC review. *Axon Enter.*, 598 U.S. at 185; *Thunder Basin*, 510 U.S. at 215. Second, Plaintiff's challenge of Defendants' disciplinary proceedings is not "wholly collateral to [the Exchange Act's] review provisions." *Thunder Basin*, 510 U.S. at 212. Finally, even if Defendants' adjudicatory panel and the SEC have no expertise

in addressing this kind of due process claim, "constitutional claims [] can be meaningfully addressed in the Court of Appeals." *Id.* at 215.

As this court previously noted, "the nature of constitutional claims asserted is of great significance in jurisdictional determinations." Order Denying TRO at 10. And the court again concludes that it does not have subject matter jurisdiction over Plaintiff's due process claim. Thus, the court GRANTS Defendants' motion as to Plaintiff's fourth claim (due process) for lack of jurisdiction.

## II.    APPOINTMENTS CLAUSE AND SEPARATION-OF-POWERS

Next, Defendants argue that Plaintiff's first and second claims should be dismissed because Plaintiff fails to demonstrate that NSCC is a governmental entity for purposes of its structural constitutional challenges. To determine whether a party is a governmental entity subject to the Appointments Clause and separation-of-powers doctrine, courts consider the three factors from the Supreme Court's decision in *Lebron v. National Railroad Passenger Corporation*. *See DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 55 (2015) (applying the *Lebron* factors to conclude that Amtrak is a governmental entity for purposes of determining separation-of-powers and Appointments Clause challenges).

Where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation," the party is a governmental entity subject to constitutional constraints. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995). All factors set forth in *Lebron* must be met for the court to conclude a party is a government entity. *See e.g.*, *Herron v. Fannie Mae*, 861 F.3d 160, 1 (D.C. Cir. 2017) (holding that Fannie Mae was not a government entity even though it was created by Congress to accomplish government objectives because "the

conservatorship over Fannie Mae did not create the type of permanent government control that is required under Lebron").

In reviewing the *Lebron* factors, the court concludes Defendants are not governmental entities. First, Defendants were not created by the government. They were created by private financial market participants to facilitate clearance and settlement of security transactions. Second, although clearing agencies do serve a larger public purpose such as risk-mitigation, they were not created for the primary purpose of serving a government objective. Instead, these entities were formed to serve private market actors by clearing and settling their transactions. Finally, the government does not retain authority to appoint any of the Defendants' directors, let alone a majority of them. Unlike Amtrak, clearing agencies were not "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees." *Ass'n of Am. R.R.*, 575 U.S. at 54.

Plaintiff does not present its argument within this legal framework, but instead asserts that its structural constitutional challenges apply to Defendants because they wield "significant executive power" and engage in state action. But this is not the test for Plaintiff's separation-of-powers or Appointments Clause claims. The Supreme Court has repeatedly reaffirmed the application of the *Lebron* factors to claims involving structural constitutional challenges, particularly ones involving claims under the Appointments Clause. *See, e.g.*, *Ass'n of Am. R.R.*, 575 U.S. at 53 (2015); *Free Enter.*, 561 U.S. at 486.

Thus, in failing to adequately allege that Defendants are a government entity, Plaintiff fails to a state a legally sufficient claim under the separation-of-powers doctrine or the Appointments Clause. The court therefore GRANTS Defendants' motion with respect to Plaintiff's first (separation-of-powers doctrine) and second (Appointments Clause) claims.

### III. NONDELEGATION DOCTRINE

Defendants also argue that Plaintiff fails to state a claim under the nondelegation doctrine. The nondelegation doctrine arises from Article I of the Constitution, which provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art I., § 1. Most nondelegation claims challenge instances of Congress delegating its legislative powers to another branch of government, typically agencies in the executive branch. Here, Plaintiff claims that Congress has unconstitutionally delegated its legislative powers to private corporations, clearing agencies.

Delegation itself is not necessarily unconstitutional. In delegating legislative authority, Congress need only articulate an "intelligible principle." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001). Because the standard is such a low bar for Congress to achieve, most nondelegation challenges fail. *See Gundy v. United States*, 588 U.S. 128, 212 (2019) (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)) ("Only twice in this country's history has the Court found a delegation excessive, in each case because Congress had failed to articulate any policy or standard to confine discretion. By contrast, the Court has over and over upheld even very broad delegations." (internal quotation marks omitted)).

Here, the Exchange Act directs the SEC "to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities." 15 U.S.C. § 78q-1(a)(2)(A)(i). This language is more than adequate to meet the tremendously low hurdle for Congress to clear. *See* Gundy, 588 U.S. at 146 (collecting cases in which the Supreme Court has found an intelligible principle where Congress directs agencies to "regulate in the public interest," "set fair and equitable prices," set "just and reasonable rates," and "issue whatever air quality standards are requisite to protect the public health."). But even if the

Exchange Act does not articulate an "intelligible principle," Defendants are not governmental entities subject to structural constitutional challenges. Thus, the nondelegation doctrine does not apply to them.

Plaintiff responds that Defendants' regulatory and enforcement powers violate the private nondelegation doctrine. Under this doctrine, "a private entity may wield government power only if it functions subordinately to an agency with authority and surveillance over it." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 423 (5th Cir. 2024); *see also Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *Consumers' Rsch. v. FCC*, 88 F.4th 917, 926 (11th Cir. 2023); *Pittson Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128 (3d Cir. 1989). This requires that the private entity "act only as an aid to an accountable government agency that retains the ultimate authority to approve[], disapprove[], or modif[y] the private entity's actions and decisions on delegated matters." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1325 (D.C. Cir. 2024).

Here, clearing agencies function subordinately to the SEC, and the SEC retains authority over clearing agencies by overseeing their rules, adjudicatory decisions, and registration. The SEC must approve any rule promulgated by a clearing agency before its implementation, including the ENC Rule at issue in this case. And, as Plaintiff well knows because Alpine requested it, the SEC may also review any adjudicatory action taken by a clearing agency, including disciplinary proceedings. Indeed, courts have long upheld the SEC-SRO model because SROs "exercise authority subject to SEC oversight" and "have no authority to regulate independently of the SEC's control." *NASD v. SEC*, 431 F.3d 803, 811 (D.C. Cir. 2005); *see also R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Todd & Co. v. SEC*, 557 F.2d

1008, 1012–13 (3d Cir. 1977); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982).

Plaintiff points to the Fifth Circuit decision in *National Horsemen's Benevolent & Protective Association v. Black (Horsemen's II)*, arguing that the holding applies to Defendants' unchecked enforcement power. 107 F.4th 415 (5th Cir. 2024). Like unconstitutional delegations of legislative power, "the private nondelegation doctrine forbids unaccountable delegations of executive power." *Id.* at 428. In *Horsemen's II*, the Fifth Circuit held that the Horseracing Integrity and Safety Act's enforcement provisions violated the private nondelegation doctrine because they empowered a private entity, the Horseracing Integrity and Safety Authority ("the Authority"), "to investigate, issue subpoenas, conduct searches, levy fines, and seek injunctions—all without the FTC's say-so." *Id.* at 420.

Plaintiff argues that Defendants wield the same enforcement power without SEC oversight. But unlike the Authority in *Horsemen's II*, Defendants do not have the responsibility under the Act to "investigate potential violations" of the Act, "levy[] sanctions," or "bring[] suit against violators for injunctive relief or to enforce sanctions." *Id.* at 429. Rather, Defendants' enforcement actions concern their own rules for their members. They do not enforce the Securities and Exchange Act or any other federal law. And even if they did, the Fifth Circuit distinguished the Authority from SROs, such as the Financial Industry Regulatory Authority ("FINRA"), that assist the SEC in enforcing securities law. The Fifth Circuit concluded that "the SEC retains formidable oversight power to supervise, investigate, and discipline [FINRA] for any possible wrongdoing or regulatory missteps." *Id.* at 435. And the same oversight, if not more, applies to clearing agencies. Because the clearing agencies have neither the lack of

oversight nor the executive power as the Authority in *Horsemen's II*, the court finds Plaintiff's argument unpersuasive.

Plaintiff also cites the recent decision in its case against FINRA to support its private nondelegation doctrine claim. In *Alpine Securities Corporation v. Financial Industry Regulatory Authority*, the D.C. Circuit held that FINRA is likely to have violated the private nondelegation doctrine when it initiated expedited disciplinary proceedings against Alpine that could result in the expulsion of Alpine from FINRA. 121 F.4th 1314, 1325 (D.C. Cir. 2024). Because federal law requires broker-dealers to be members of FINRA, expulsion could effectively ban Alpine from the securities industry. Further, FINRA was able to do so before the SEC could review its decision. "The result of this regulatory scheme is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade securities under federal law." *Id.* at 1238. Thus, the D.C. Circuit found that Alpine would likely succeed on the merits of its private nondelegation doctrine claim against FINRA.

But this case is distinguishable for two reasons. First, the proceedings at issue before the court are not expedited. The D.C. Circuit specifically noted that its holding does not apply to cases in which an SRO can "delay the effectiveness of its expulsion orders . . . ." or where the SEC has "authority to lower its stay standard in expulsion cases." *Id.* at 1331. Here, Plaintiff was notified of Defendants' decision to cease to act for it in November 2023. Four months later, Defendants affirmed their decision after their own internal review, which included a hearing. Defendants then allotted Plaintiff thirty days before implementation of the order so that Plaintiff could seek review from the SEC. During this time, Plaintiff requested review by the SEC and a stay pending the SEC's review of Defendants' determination. The SEC granted an administrative stay pending review of the motion to stay. Thus, Defendants' decision to cease to act for Plaintiff

15

did not take immediate effect before SEC review. Unlike the *FINRA* case, Plaintiff has not shown on the record that clearing agency cease to act orders "take effect immediately, before the SEC can review them." *Id.* at 1326.

Second, although broker-dealers are required by federal law to register with FINRA, they are not required to be members of clearing agencies. Plaintiff claims that, because Defendants have "acquired a virtual monopoly over the clearing and settlement process," a termination of their membership in NSCC is tantamount to a corporate death sentence. Pl.'s Am. Compl. ¶ 7; *see also* ECF No. 69 ("Pl.'s Opp.") at 10.

But Defendants are not the only clearing agencies registered with the SEC. Thus, Defendants' decision to cease to act for Plaintiff does not have the same legal effect as FINRA's expulsion decision. Plaintiff may still legally participate in the securities industry even if that participation is, as a matter of operation or function, difficult. Unlike FINRA, Defendants alone do not "effectively decide who can trade securities under federal law." *Id.* at 1328. Therefore, the court finds the *FINRA* case to be distinguishable from the facts of this case and declines to apply the D.C. Circuit's holding here.

Plaintiff's claim under the private nondelegation doctrine fails to demonstrate that clearing agencies wield governmental power without SEC oversight. Unquestionably, Defendants act only as an aid to and function subordinately to the SEC. The Commission retains ultimate authority over Defendants' rule promulgation, adjudicatory decisions, and ultimately, their existence as the SEC can approve or revoke their registrations. Because Plaintiff fails to assert a legally sufficient claim under the nondelegation doctrine, the court GRANTS Defendants' motion on Plaintiff's third claim (nondelegation doctrine).

## CONCLUSION AND ORDER

For the reasons above, the court finds it does not have subject matter jurisdiction to adjudicate Plaintiff's fourth claim under the Due Process Clause. The court also finds that Plaintiff fails to state a claim under the Appointment Clause, separation-of-powers doctrine, and nondelegation doctrine. Thus, the court GRANTS Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff's due process claim is DISMISSED WITHOUT PREJUDICE. Plaintiff's remaining claims under the separation-of-power doctrine, Appointments Clause, and nondelegation doctrine are DISMISSED WITH PREJUDICE.

DATED March 25, 2025

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge